[No. C013235. Third Dist. Oct. 22, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY DEE SUTTON, Defendant and Appellant.

796

## COUNSEL

David J. Briggs, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edmund D. McMurray and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

DAVIS, J.—A jury convicted defendant of failing to appear on a felony charge. (Pen. Code, § 1320.5.) Granted probation, defendant appeals, contending the trial court abused its discretion by admitting evidence of his other crimes, his custodial status, and his exercise of extradition rights. Defendant also claims the trial court violated due process by admitting the evidence regarding his exercise of extradition rights. We see merit in defendant's arguments, particularly those relating to the evidence regarding the extradition rights. Consequently, we reverse.

### BACKGROUND

On May 29, 1991, defendant, who was on bail, appeared in the Yolo County Superior Court regarding a felony charge against him. (People v. Sutton (Super. Ct. Yolo County, No. 12470).) At that time he moved for a continuance to obtain new counsel. In a minute order, the trial court granted "a continuance to JUNE 12, 1991 at 9:00 a.m. for appearance of new Counsel." On June 12, defendant did not appear but his counsel did. The trial court issued a bench warrant for defendant. At his trial on the failure to appear charge (i.e., the case on appeal here, Yolo County Superior Court No. 13419), defendant stipulated that on June 12, 1991, he was charged with a felony in Yolo County Superior Court No. 12470 and that his first appearance in that court following June 12, 1991, was on September 13 of that year.

Just prior to this stipulation being entered into the trial record, the police officer who had arrested defendant on the underlying felony charge testified, over defendant's objection, that he (the officer) was a member of the "Yolo Narcotic Enforcement Team" and had arrested defendant based on the defendant's "conduct." The trial court had overruled defendant's objection to this testimony, noting the People had to prove there was an underlying felony charge and the officer's testimony that defendant was arrested for a felony was preliminary to that purpose.

The custodian of records for the Yolo County Sheriff's Department provided testimony based on records maintained by or sent to the Yolo County

Sheriff.[1] These records showed that defendant was taken into custody in Polk County, Nebraska, on June 19, 1991. This detention apparently was for a charge of "criminal non-support." Defendant objected to evidence of this charge, and the trial court admonished the jury to disregard any reference to any other alleged crime. These records showed that Yolo County officials notified Nebraska authorities they would seek defendant's extradition. The authorities in Nebraska confirmed this, and stated they would keep Yolo County apprised of defendant's status. Defendant was then transferred to custody in Hamilton County, Nebraska, where he remained until released, apparently on his own recognizance, on July 3, 1991. The records showed that on July 6, 1991, defendant was detained for speeding in Cherry County, Nebraska (67 miles per hour in a 55 miles per hour zone) and taken into custody as a "fugitive from justice" pursuant to the Yolo County felony warrant.

The records also showed that on July 9, 1991, an extradition hearing was held in the Cherry County, Nebraska, court and the court informed defendant that he had the right to an attorney, the right to have bail set, the right to test the legality of his arrest in Nebraska, and the right to contest the extradition through an application for habeas corpus. Defendant remained in custody until July 10, and then posted bail.

Defendant refused to waive extradition and filed a petition for writ of habeas corpus in propria persona in the Cherry County court. Yolo County began preparing documents for an extradition request. Counsel was appointed for defendant in the Cherry County extradition proceedings and a hearing on defendant's habeas petition was held there on July 30 and August 27 and continued to September 10, 1991. On August 27, California's Governor sent a requisition for defendant's extradition to Nebraska's Governor.

The Yolo County District Attorney, Charles Van Court, who prosecuted the underlying felony charge against defendant, testified extensively about extradition procedure and about the actions taken by Yolo County and by defendant regarding the extradition proceedings in Nebraska. At one point, Van Court testified generally that the "nature and seriousness of [an] underlying case" are the deciding factors on whether to seek extradition. Defendant unsuccessfully objected to the relevancy of this testimony. The trial court later instructed the jury not to consider the nature of the underlying offense in its deliberations.

Defendant returned to California and surrendered to Yolo County officials on September 10, 1991, while his habeas corpus proceedings were pending in Nebraska.

---

[1] Over a defense objection, these records were admitted into evidence as well.

Defendant objected to the admission of the Yolo County Sheriff's records and the testimony of District Attorney Van Court to the extent they concerned the extradition proceedings in Nebraska and discussed other criminal charges. Through a motion *in limine*, objections made at trial, a motion for a mistrial and a motion for a new trial, defendant objected to the extradition evidence on the alternate grounds of relevancy, Evidence Code section 352, and due process considerations. The People countered that defendant's refusal to waive extradition and return voluntarily to California prior to Yolo County's extradition efforts constituted evidence of defendant's (continuing) intention to evade the process of the Yolo County court. The trial court struggled with this issue, ultimately ruling the evidence was admissible but noting it was "pretty remote", "it [was] not going to sound very good," and it presented a "very close" case.

## DISCUSSION

Although the evidence regarding "criminal non-support" and speeding charges against defendant and the evidence concerning the nature of the underlying criminal charge in this case raise questions regarding the fairness of this trial, the trial court did instruct the jurors to disregard these matters. We presume the jurors did so. (*People* v. *Ryan* (1981) 116 Cal.App.3d 168, 179 [171 Cal.Rptr. 854].) ■ Our focus, therefore, as is defendant's, is with the evidence that defendant exercised certain extradition rights in Nebraska. This evidence was admitted to show defendant's intent on June 12, 1991, to evade the process of the Yolo County court. ■ Under the applicable failure to appear statute—Penal Code section 1320.5—the prosecution must prove that a defendant willfully failed to appear on a felony charge and did so with the intent to evade the process of the court. (*People* v. *Wesley* (1988) 198 Cal.App.3d 519, 522 [243 Cal.Rptr. 785].)

■ In light of defendant's objections at trial, the admission of the extradition evidence raises issues of probative value/prejudicial effect and due process. A similar analytical framework appears in *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240]. In that case, Doyle was arrested and given *Miranda* warnings and exercised his right to remain silent.[2] At trial, however, he claimed he had been "framed." On cross-examination, the prosecution was allowed to impeach Doyle's exculpatory story by asking him why he had not mentioned it earlier. Doyle was convicted. The Supreme Court reversed. After noting that a postarrest silence is of dubious probative value because of its "insolubly ambiguous" nature—for there may be several explanations for the silence that are

---

[2]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

consistent with an exculpatory explanation or the silence may be nothing more than the arrestee's exercise of his or her *Miranda* rights—the high court held that as a matter of due process, based on fundamental fairness, the prosecutor should not be allowed to use the fact of a suspect's post-*Miranda* warning silence against him at trial. (426 U.S. at pp. 617-618 [49 L.Ed.2d at pp. 97-98]; see also *Wainwright* v. *Greenfield* (1986) 474 U.S. 284, 291, fn. 7 [88 L.Ed.2d 623, 629-630, 106 S.Ct. 634]; *United States* v. *Hale* (1975) 422 U.S. 171 [45 L.Ed.2d 99, 95 S.Ct. 2133]; *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].)

The trial court in the present case struggled with the probative value and prejudicial effect of the evidence that defendant had exercised some of his extradition rights. At one point the court tentatively agreed that the prejudicial effect of this evidence outweighed its probativeness. The trial court ultimately admitted the evidence.

The evidence was offered to show defendant's specific intent to evade the process of the Yolo County Superior Court on June 12, 1991. (Pen. Code, § 1320.5; *People* v. *Wesley, supra*, 198 Cal.App.3d at pp. 522-523.) But defendant was not first informed of his extradition rights until nearly a month later—on July 9, 1991—and he did not begin exercising those rights until that time. As the trial court itself recognized, the probative value of this evidence to defendant's specific intent on June 12, 1991, is tenuous given this chronology.

We must also keep in mind the precise nature of the specific intent at issue; as stated in *Wesley*, "[n]ot only must the individual intend to fail to appear, but also he or she must intend the failure to appear to 'achieve some additional purpose,' i.e., 'to evade the process of the court.'" (198 Cal.App.3d at p. 522.) For example, in *Wesley*, the defendant left the courthouse during a lunch break in his preliminary hearing and did not return that day at the appointed time. He appeared the next day, claiming he had left because his medication had made him ill and disoriented. The appellate court in *Wesley* reversed the defendant's failure to appear conviction because the trial court had not instructed the jury that to convict they needed to find defendant specifically intended to evade the process of the court.

In the extradition proceedings here, the Cherry County (Nebraska) court informed defendant on July 9 that he had the right to counsel, the right to test the legality of his Nebraska arrest, the right to have bail set and the right to contest extradition via a petition for writ of habeas corpus. Defendant refused to waive extradition, secured bail, filed a petition for writ of habeas corpus, had counsel appointed, and continued with the habeas corpus process through two hearings.

There are several reasons why defendant may have chosen to exercise these extradition rights that do not evidence a specific intent to evade the process of the Yolo County court. For example, when defendant was first informed of his extradition rights he did not have a lawyer; he may have exercised this right so he could consult with one. Defendant may have wished to test the legality of his Nebraska arrest, or to be admitted to bail for his convenience in Nebraska and upon his return to California, or to arrange a negotiated disposition of his Yolo County case. Perhaps defendant believed he had legitimate questions about whether he was properly identified as the person subject to the extradition proceedings. Perhaps he exercised his habeas corpus rights and continued with the extradition process on the advice of counsel. Defendant's extradition actions in the wake of the provision of these rights may have been nothing more than the exercise of them. (See *Doyle* v. *Ohio, supra,* 426 U.S. at p. 617 [49 L.Ed.2d at p. 97].) In other words, defendant's extradition actions are "insolubly ambiguous" because of what the government advised him regarding his extradition rights. (*Ibid.*) In this context, defendant's refusal to waive extradition, his request for counsel, his filing of a petition for writ of habeas corpus, and his hearings on that habeas petition are of "dubious probative value." (*Id.*, at p. 617, fn. 8 [49 L.Ed.2d at pp. 97-98].)

The People argue there was no ambiguity "at all" in defendant's conduct; all of defendant's extradition actions, the People assert, boil down to one thing: avoiding or at least forestalling his return to California. We disagree for the reasons just stated.

The People also argue that the probative value of defendant's conduct is strong because his flight and extended efforts to avoid returning to California were themselves part of a continuous evasion of the process of the Yolo County court. As we have seen, however, while defendant's flight may be one thing in the evidentiary equation, his extradition efforts may be quite another given the extradition rights he was afforded. In any event, it can also be said that defendant, who was free on bail during most of the extradition proceedings, subjected himself to the process of the court during the period of those proceedings (appearing at hearings on July 30 and August 27), eventually surrendering to Yolo County authorities on September 10 while the proceedings were pending.

There is a paucity of case law concerning the relevance or probative value of exercising extradition rights. However, a decision from the Connecticut Supreme Court supports our conclusion that this evidence has little worth here. In *State* v. *Mayell* (1972) 163 Conn. 419 [311 A.2d 60], the state introduced evidence—for the purpose of showing flight and a consciousness

of guilt in a robbery trial—that defendant had contested his extradition. The *Mayell* court concluded the evidence was insufficient for that purpose and reversed the defendant's conviction, reasoning: "That the defendant exercised his legal right to defend against his extradition in New York proceedings is not a proper basis for inferring that the defendant fled from the police or possessed a consciousness of guilt—just as pleading not guilty or defending against any criminal charge is not a proper basis for inferring a consciousness of guilt." (311 A.2d at p. 63; accord, *State* v. *Burak* (1986) 201 Conn. 517, 529-530 [518 A.2d 639].) As in *Mayell*, the prosecution here tendered evidence that defendant exercised his extradition rights for the purpose of showing a "state of mind"—his intent to evade the process of the court. As in *Mayell*, the probative value of this evidence is similarly limited.

Aside from the probative value of the extradition evidence, there is the pressing concern of due process. Due process was the focus in *Doyle*. In that case, the court held it would be fundamentally unfair and a deprivation of due process to allow an arrestee's silence to be used to impeach an explanation subsequently offered at trial since the *Miranda* warnings implicitly assure the arrestee that such silence will carry no penalty. (426 U.S. at pp. 618-619 [49 L.Ed.2d at pp. 98-99]; *Wainwright* v. *Greenfield, supra*, 474 U.S. at pp. 289-291, fn. 7 [88 L.Ed.2d at pp. 628-630], 293-294, fn. 12 [88 L.Ed.2d at pp. 631-632].) Due process may also be a concern in *Mayell*, albeit implicitly. There, the court held essentially that the exercise of a "legal right" to defend against extradition "is not a proper basis for inferring" an illegal state of mind—just as defending against any criminal charge is not a proper basis for inferring a consciousness of guilt. (311 A.2d at p. 63.) Based on these cases, an element of due process fairness is implicated here: the exercise of a legal right in an extradition proceeding should not be held against the person who exercises it if there is an implicit assurance that its exercise carries no penalty.

This is precisely the situation in the present case. The government provided defendant with a litany of rights he could exercise in extradition proceedings. The government did not indicate in any fashion that there would be any adverse consequences to defendant if he chose to exercise those rights. Now that defendant has chosen to do so, the government wants that exercise to be a major part of its case-in-chief to convict defendant of a felony offense. This cannot be squared with fundamental fairness—in other words, there is a "problem of fundamental unfairness that flows from the State's breach of its implied assurances." (*Wainwright, supra,* 474 U.S. at p. 294 [88 L.Ed.2d at pp. 631-632].)

Furthermore, the pleading which initiated the extradition proceedings against defendant alleged that on January 31, 1991, he committed the offense

underlying the failure to appear charge and on June 12, 1991, he failed to appear regarding that offense. So the extradition pleading is grounded partly on the failure to appear charge. In view of the People's position on the use of the extradition evidence here, this results in a confusing procedure at odds with due process. This is because the People, on the one hand, notify defendant that the extradition proceeding against him flows partly from his failure to appear charge, but on the other hand fail to inform him that any exercise of the extradition rights they have provided him can be used to convict him of that charge. Besides being confusing, this is unseemly.

There is a case in California that applies a *Doyle* analysis to an extradition proceeding, *People* v. *Jaspal* (1991) 234 Cal.App.3d 1446 [286 Cal.Rptr. 337]. In *Jaspal*, the defendant was wanted for murder in California but was apprehended in England. At an extradition hearing in England, several defense witnesses testified falsely that defendant had been in England on the night of the murder. Defendant remained silent throughout the extradition proceedings. At trial in California, defendant presented a different defense: that he was at the site of the murder but slept through it because he was intoxicated. The prosecutor was allowed in cross-examination to impeach defendant's credibility by using the evidence of defendant's silence in the extradition proceedings to show these conflicting defenses.

Citing *Doyle*, the court in *Jaspal* reversed the conviction, reasoning that ". . . it was [defendant's] silence at an extradition hearing, a proceeding criminal in nature, that was used against him and interpreted as an adoptive admission of the false testimony presented by others at the extradition hearing," and that defendant's "choice to remain silent at a proceeding, criminal in nature, also goes to the heart of our requirement that it is the prosecution's burden to prove its case and that the defendant need not testify in his own behalf and his silence is not to be used against him." (234 Cal.App.3d at pp. 1456-1457.)

The People argued below that *Doyle* and *Jaspal* involved the protection of fundamental constitutional rights while the " 'constitutional rights' alleged by defendant are [only] procedural due process rights" associated with the extradition process. We find this argument unpersuasive for two reasons. (3) First, there is nothing cavalier about procedural due process rights. In fact, such rights comprise the original cornerstone of the due process clause. (See 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 481, pp. 668-669.) And the central meaning of procedural due process is that parties whose rights are to be affected are entitled to be heard at a meaningful time and in a meaningful manner. (*Ibid.*; *Fuentes* v. *Shevin* (1972) 407 U.S. 67, 80 [32 L.Ed.2d 556, 569-570, 92 S.Ct. 1983]; *Orloff* v.

*Cleveland* (9th Cir. 1983) 708 F.2d 372, 379.) Needless to say, one cannot meaningfully be heard if the exercise of his legal rights to be heard can be used to convict him of a criminal offense. If we were to adopt the People's position regarding this evidence we would significantly impair a person's legal right to contest extradition. Second, as defendant notes, although the rights in issue may be different, the principle of unfairness in penalizing their exercise is the same. The government implicitly assured defendant that his exercise of extradition rights would not be used against him; the government then breached that assurance in the Yolo County trial court. (See *Wainwright, supra,* 474 U.S. at pp. 290-291, 293-294 [88 L.Ed.2d at pp. 629-620, 631-632].) The unfair treatment of defendant here parallels that of the defendant in *Doyle.*

On appeal, the People have taken this argument a step further. They note that while the rights at the center of *Doyle* are constitutionally based, the rights accorded defendant here are statutory creations. Although this is true, we think this is a distinction without a difference because the principle of unfairness is the same in this case whether the rights at issue are statutorily created or constitutionally based.

It is settled that the guaranty of due process extends to rights created under the Constitution or state law. (*Meachum* v. *Fano* (1976) 427 U.S. 215 [49 L.Ed.2d 451, 460, 96 S.Ct. 2532]; *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 951, 94 S.Ct. 2963]; *Beck* v. *Ransome-Crummey Co.* (1919) 42 Cal.App. 674 [184 P. 431]; *People* v. *Ramirez* (1979) 25 Cal.3d 260, 265 [158 Cal.Rptr. 316, 599 P.2d 622]; see *Schultz* v. *Regents of University of California* (1984) 160 Cal.App.3d 768 [206 Cal.Rptr. 910].) The due process clause may be invoked " 'to insure that [a] state-created right is not arbitrarily abrogated.' " (*Meachum, supra,* 427 U.S. at p. 226 [49 L.Ed.2d at p. 460] quoting *Wolff, supra,* 418 U.S. at p. 557 [41 L.Ed.2d at pp. 951-952]; see *Beck, supra,* 42 Cal.App. at p. 678.) ■ What implicates due process here is not the derivation of the legal rights at issue—constitutional or statutory—but rather the principle that the state cannot provide a right, implicitly assure that its exercise carries no penalty, and then use that exercise as prosecution evidence to support a felony conviction. "The touchstone of due process is protection of the individual against arbitrary action of government . . . ." (*Wolff, supra,* 418 U.S. at p. 558 [41 L.Ed.2d at p. 952].) To penalize, in this way, the exercise of a statutory right to be heard cannot be squared with fundamental fairness. (*Wainwright, supra,* 474 U.S. at p. 294 [88 L.Ed.2d at pp. 631-632].)

We conclude the trial court violated due process by admitting the evidence regarding defendant's exercise of his extradition rights. ■ Because a

constitutional violation is involved, a reversal is required unless we can say the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *see People* v. *Jaspal, supra*, 234 Cal.App.3d at p. 1461.) As we explain, we cannot say the error was harmless in this way.

■ Preliminarily, we note the trial court instructed the jury that "[e]vidence has been introduced that the accused contested extradition to California. Persons have a statutory (legal) right to contest extradition." Defendant requested this instruction, but the court refused to provide the proposed instruction's final sentence, which read: "You may not use evidence of contested extradition to show that the accused was willfully evading the process of the court."

The instruction as given by the trial court, although logical in light of the admission of the extradition evidence, offered little in the way of cure. Its edited phrasing did little more than further highlight the extradition evidence that had been presented. And it was the extradition evidence that constituted the bulk of the prosecution's *case-in-chief.* Looking at the evidence in this case quantitatively, as the defendant notes, two of the three witnesses and ten of the seventeen documents dealt with the extradition proceedings or with defendant's exercise of his extradition rights. A similar pattern is apparent in the prosecutor's closing argument, where comment on the extradition evidence covered more pages of transcript than any other subject. Like the prosecutor in *Jaspal,* the prosecutor here spent a lot of "time and energy . . . on this subject" and the matter was raised a "number of times." (See *People* v. *Jaspal, supra*, 234 Cal.App.3d at p. 1461.)

The very purpose of this evidence was to show a specific intent to evade the process of the court. The prosecutor hammered home this point in her argument to the jury. Under *People* v. *Wesley, supra,* as we have seen, not only must the accused intend to fail to appear, he or she must intend the failure to appear "to 'achieve some additional purpose,' i.e., 'to evade the process of the court.' " (198 Cal.App.3d at p. 522.) In this quantitative and qualitative barrage, then, the fact that defendant had a legal right to contest extradition probably received little notice by the jury.

Our harmless error analysis would present a closer question had the evidence before the jury contained an explicit order to defendant to appear on June 12, 1991. After all, defendant was found half a continent away in Nebraska when he had court proceedings pending in California. But the evidence the jury actually had regarding the order to appear is problematic. The parties stipulated at trial that on June 12, 1991, defendant was charged

with the commission of a felony in Yolo County Superior Court and that defendant's first appearance in that court following June 12 was on September 13, 1991. A sanitized minute order was admitted into evidence showing that defendant appeared in the Yolo County court on May 29, 1991, and moved for a continuance to obtain new counsel. This order further states: "Court grants a continuance to JUNE 12, 1991 at 9:00 A.M. *for appearance of new Counsel.*" (Italics added.) The minute order for the June 12 proceedings, also admitted into evidence, shows that defendant's counsel appeared on that date.[3]

In view of the above, we cannot say the trial court's due process violation was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18; see *People* v. *Jaspal, supra,* 234 Cal.App.3d at p. 1461.)

The judgment is reversed.

Sims, Acting P. J., concurred.

**RAYE, J.,** Dissenting.—Because I disagree with my colleagues in their application of basic principles of evidence and constitutional law, I must respectfully dissent. *State* v. *Mayell* (1972) 163 Conn. 419 [311 A.2d 60], cited by the majority for the proposition that exercise of a legal right to defend against extradition is not a proper basis for inferring an illegal state of mind, does not cut so broad a swath. The defendant in *Mayell* worked in New York and was charged with robbery in nearby Connecticut. The only evidence connecting defendant to the crime was his fingerprint on his New York employer's car which was abandoned at the crime scene. Following his apprehension defendant refused extradition from New York. At trial the prosecution attempted to prove defendant "fled" from the scene of the crime. Defendant denied being at the crime scene and having any knowledge he was wanted by the police. Acknowledging that "[f]light, when unexplained, tends to prove consciousness of guilt" (*id.* at p. 63), the court observed the only evidence of flight was the fact that defendant resisted extradition. Such evidence, according to the court, was "not a proper basis for inferring that the defendant fled from the police or possessed a consciousness of guilt . . . ." (*Ibid.*) The court's conclusion was unremarkable. Unless one assumed the defendant's guilt of the underlying offense, defendant's arrest in a nearby city and refusal to waive extradition proved very little.

The mental state at issue in the present case is the intent to evade the process of the court. Defendant was well aware of the felony charge against

---

[3]On appeal, defendant concedes the evidence was uncontroverted that he was required to appear on June 12, 1991. Our review of the evidence he cites, as well as all the evidence on the subject, convinces us the issue for the jury was not so clear-cut, at least for constitutional harmless error purposes.

him and the time fixed for him to appear in court. The fact that he was apprehended "half a continent away" and upon apprehension declined to voluntarily return is evidence of a continued intent to evade the process of the court. Unlike the defendant's actions in *Mayell*, which were facially neutral, the very act of refusing extradition tends to prove the defendant in the present case intended to evade the process of the court.

The majority suggests several innocent reasons why defendant may have chosen to exercise his extradition rights and complains the probative value of defendant's refusal to waive extradition is "limited." However, the standard for admissibility is whether proffered testimony tends logically, naturally, or by reasonable inference to establish a material fact, not whether it conclusively proves it. (*People* v. *Yu* (1983) 143 Cal.App.3d 358 [191 Cal.Rptr. 859].) That defendant's exercise of extradition rights *could* have been prompted by other reasons does not preclude a finding that it *in fact* reflected a continued intent to evade the process of the courts.

The majority's analysis of *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] also strays from the mark. The majority correctly notes that in *Doyle* the court held "*Miranda* warnings implicitly assure the arrestee that . . . silence will carry no penalty." (Maj. opn., *ante*, at p. 802.) However, the implication arises from the express warning required by *Miranda* that anything a defendant says may be used against him. A warning that any statement made by a person may be used against the person logically implies that silence will not be so used. There is no indication in the record that rights extended fugitives under Nebraska extradition statutes are analogous to *Miranda* warnings. A warning that a fugitive has the right to refuse extradition does not imply the refusal cannot be used against the fugitive in later criminal proceedings.

*People* v. *Jaspal* (1991) 234 Cal.App.3d 1446 [286 Cal.Rptr. 337] is likewise inapposite. In *Jaspal* as in *Doyle*, defendant chose to exercise his *Miranda* right to remain silent. The court, not bothering to restate the *Doyle* rationale, simply declared "Any comment on, or impeachment use of, a defendant's silence after warnings on his right to remain silent is improper." (*Id.* at p. 1455.) While the right was exercised in the context of an extradition proceeding, that fact was of no moment. *Jaspal* adds nothing to *Doyle*'s analysis of *Miranda* rights and provides no further enlightenment in resolving the issue presented in our case.

In most cases defendant's refusal to waive extradition will be irrelevant and therefore inadmissible to prove guilt of an offense. Consequently, the constitutional issue raised by the present case will rarely arise. Where, as

here, evidence of such refusal is otherwise admissible, considerations of due process do not preclude its use. The majority err in concluding otherwise.

In summary, the majority err in determining the refusal to waive extradition was of no probative value, and compound their error by deciding the admission of such evidence also offended due process. This conclusion finds no support in logic nor the cases cited.